UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:19-CV-578

| | |
|---|---|
| **PAUL MANOS and MARGARET M. MANOS**<br><br>**Plaintiffs**<br><br>v.<br><br>**FREEDOM MORTGAGE CORPORATION**<br><br>**Defendant** | **COMPLAINT**<br><br>**WITH DEMAND FOR TRIAL BY JURY** |

**NOW COMES** Plaintiffs, Paul Manos and Margaret M. Manos, by and through Counsel, and pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681 et seq., N.C. Gen. Stat. § 75-1.1, and N. C. Gen. Stat. § 75-50, *et seq.*, respectfully pleads to this Court the following:

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 15 U.S.C. § 1681p, 28 U.S.C. § 1331 and 28 U.S.C. 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

3. This case is brought within two years of the alleged FCRA violations in compliance with the statute of limitations at 15 U.S.C. §1681p.

4. This case is brought within four years of the alleged North Carolina General Statute violations in compliance with the statute of limitations at N.C. Gen. Stat. § 75-16.2

## PARTIES

5. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

6. Paul Manos and Margaret M. Manos ("Plaintiffs") are individuals and citizens of the State of North Carolina who currently reside in Mecklenburg County, North Carolina.

7. At all times relevant to this action the Plaintiffs were "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

8. At all times relevant to this action the Plaintiffs were "consumers" as defined by N.C. Gen. Stat. § 75-50(1).

9. Defendant, Freedom Mortgage Corporation ("Freedom"), is a "person" as defined in 15 U.S.C. § 1681a(b).

10. Freedom is a business entity which regularly conducts business nationally and has its corporate office at 907 Pleasant Valley Avenue, Mount Laurel, New Jersey 08054-1210.

11. Freedom can be reached for service through its Registered Agent, CT Corporation System at 160 Mine Lake Ct, Suite 200, Raleigh, North Carolina 27615-6417.

12. At all times relevant to this action Freedom was engaged in commerce in North Carolina.

13. At all times relevant to this action Freedom was a "debt collector" as defined by N.C. Gen. Stat. §75-50(3).

14. The alleged debt at issue arose out of a transaction that was primarily for personal, family or household purposes.

15. At all times relevant to this action the alleged debt in this matter was a "debt" alleged to be owed as defined by N.C. Gen. Stat. §75-50(2).

16. Equifax Information Services, LLC (Equifax), is a Georgia limited liability company doing business throughout the country and in the state of North Carolina.

17. Equifax is a "consumer reporting agency" (CRA) as defined in 15 U.S.C. § 1681a(f).

18. Experian Information Solutions, Inc. (Experian), is an Ohio based company doing business throughout the country and in the state of North Carolina.

19. Experian is a "consumer reporting agency" (CRA) as defined in 15 U.S.C. § 1681a(f).

20. TransUnion, LLC ("TransUnion"), is a Delaware limited liability company doing business throughout the country and in the state of North Carolina.

21. TransUnion is a "consumer reporting agency" (CRA) as defined in 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

22. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein

23. In or around May 2015, the Plaintiffs refinanced their home.

24. The Plaintiffs' new lender for their mortgage became New York Community Bank.

25. On or around November 8, 2017, the Plaintiffs received a "Notice of Mortgage Transfer" letter from Freedom.

26. The "Notice of Mortgage Transfer" letter stated New York Community Bank had transferred the Plaintiffs' mortgage to Freedom effective November 1, 2017.

27. In the beginning of November 2017, the Plaintiffs set up their online payment account on Freedom's website, https://myaccount.freedommortgage.com, to make their monthly mortgage payments.

28. The Plaintiffs' mortgage payment to Freedom was due the first day of each month, with a fourteen-day grace period.

29. The Plaintiffs' Freedom mortgage payment was considered late if received on the sixteenth day of the month.

3

30. The Plaintiff's made their monthly payments online through Freedom's website on the following days:

    a) Tuesday, November 14, 2017; it posted the same day.

    b) Tuesday, December 12, 2017; it posted the same day.

    c) Monday, January 8, 2018; it posted the same day.

    d) Thursday, February 8, 2018; it posted the same day.

31. On Tuesday, March 6, 2018, the Plaintiffs logged into their online account via Freedom's website to make their monthly contractual mortgage payment.

32. The Plaintiffs followed the typical steps they took to make their monthly mortgage payment with Freedom, including clicking the "payment submit" button after verifying the amount of the payment to be made. They clicked the "payment submit" button at approximately 11:26:56 P.M. EST.

33. The payment screen on Freedom's website displayed the following message at the time of payment:

    > Payment Posting Times: All payments submitted after 11pm ET will post on the next business day. Business days are Mondays through Saturdays other than the following company observed holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Sundays are not business days for purposes of payment posting. A payment submitted at any time on a Sunday will not post until the next business day.

34. Freedom's website payment system displayed no other or further message about payments made using Freedom's online payment system.

35. Freedom controlled its website and the content thereof and is responsible for any alerts that are displayed or may be needed.

36. Freedom refused to accept the Plaintiffs' payment.

37. Freedom did not alert the Plaintiffs that their payment was not accepted.

4

38. The Plaintiffs followed the exact procedure they always followed when making a payment.

39. The Plaintiffs saw no problem with their attempt to make their mortgage payment and they saw no error message on Freedom's payment portal.

40. Plaintiffs rightfully assumed their payment had been submitted.

41. Moreover, Freedom had the Plaintiffs' bank account and routing number in their records, which Plaintiffs had specifically saved to their Freedom online account when they set up in the account in November 2017.

42. Freedom had permission to draft the mortgage payment from the Plaintiffs' account.

43. Freedom should have drafted the mortgage payment from the Plaintiffs' account.

44. Because Freedom did not draft the mortgage payment, Freedom was able to charge late fees to the Plaintiffs.

45. Freedom did not draft the Plaintiffs' account so that it could charge the Plaintiffs late fees.

46. On Thursday, April 5, 2018, the Plaintiffs logged into their online account via Freedom's website to make the mortgage payment for April 2018.

47. At this time, the Plaintiffs were alerted through the website that they were past due for the March 2018 mortgage payment and they had accrued a late fee for that payment.

48. This was the first time the Plaintiffs knew that Freedom chose to not process their March mortgage payment.

49. The Plaintiffs immediately paid the past due amount, late fee, and the mortgage payment for April 2018.

50. At that point the Plaintiffs should have been current on their mortgage payments.

51. On Friday, April 6, 2018, the Plaintiffs logged onto Freedom's website to verify that the mortgage payments had posted.

5

52. Both mortgage payments for March 2018 and April 2018 had posted by that time.

53. The website also showed that the Plaintiffs were current on their mortgage payments.

54. In the month of April 2018, the Plaintiffs received a letter from Freedom that stated the Plaintiffs' mortgage had an outstanding balance.

55. The Plaintiffs called Freedom to discuss the account.

56. Upon calling Freedom, Ms. Manos spoke with an agent who used the name "Sandy," Teller ID #11362.

57. During Ms. Manos' call with Sandy, they were reassured that they did not have an outstanding balance and that the April 2018 letter must have been sent in error.

58. Though Ms. Manos made the call to resolve any alleged delinquency, Sandy did nothing to inform Ms. Manos that Freedom was reporting the Manos' as late on their mortgage payment.

59. The Plaintiffs were actively in the market to purchase a new home at that time.

60. On Monday, May 7, 2018, the Plaintiffs made an offer to purchase their current home.

61. The Plaintiffs were pre-approved with BB&T for the following jumbo loan terms based on their credit scores from prior to March 2018:

    a) An interest rate of 4.625% (with a July 25th closing date).

    b) A total loan amount of $562,500.00 (90% loan to value ratio).

    c) A down payment of $62,500.00.

62. On Tuesday, May 8, 2018, the Plaintiffs' mortgage broker at BB&T sent the Plaintiffs an urgent voicemail and follow-up email message regarding their credit reports.

63. The message informed the Plaintiffs that their credit reports showed a 30-day late payment on the Plaintiffs' credit reports.

6

64. Upon review, the 30-day late payment appeared on the TransUnion, Experian, and Equifax credit reports for both Plaintiffs.

65. This was the first notice to Plaintiffs of any late payment reported on the Plaintiffs' credit reports.

66. This misreported debt caused the Plaintiffs' credit scores to drop drastically by 102 points and 44 points.

67. Due to the lowered credit scores, the favorable terms offered to the Plaintiffs were changed to reflect the following:

    a) A higher interest rate of 4.750% (.125 increase).

    b) The total amount of the loan reduced to $453,100 (80% loan to value ratio).

    c) A greatly increased required down payment of $136,900 (increase of $107,400).

68. On the same day, May 8, 2018, Ms. Manos called and spoke with Freedom to attempt to dispute the late payment.

69. Freedom would not accept a verbal dispute and required the Plaintiffs to send a written dispute.

70. During the May 8, 2018, call to Freedom, they told Ms. Manos words to the effect that they would need to submit their dispute to an e-mail address (customercare @freedommortgage.com). They were asked to provide the loan number, the relevant facts, and the fact that they were filing a dispute.

71. During this same call, Freedom advised that this was the only way to submit an electronic dispute, which would be the fastest way for Freedom to get the information on record and then research the dispute. Freedom told Ms. Manos to call Customer Service within 24 to 48 hours, and they would have ticket number to verify that she had submitted a dispute.

72. Plaintiffs were able to use only the following customer service contacts to communicate with Freedom:
    a) Telephone: 855-690-5900
    b) Written Correspondence: P.O. Box 50428, Indianapolis, IN 46250-0401
    c) Email: customercare@freedommortgage.com
73. On Wednesday, May 9, 2018, the Plaintiffs submitted their first dispute with Freedom via electronic mail and attached copies of each of the Plaintiffs' credit reports to show history of timely made payments prior to that date.
74. On Friday, May 11, 2018, the Plaintiffs submitted additional documentation, including the screenshots from the Plaintiffs' web browser history showing the sequence of web addresses that the Plaintiffs clicked through to submit their monthly payment on March 6, 2018, via electronic mail as part of the dispute filed on May 8, 2018.
75. During the entire dispute process the Plaintiffs called almost daily to attempt to reach an employee in the department that handles disputes, or any Freedom supervisor or management.
76. Freedom repeatedly denied Ms. Manos' request to speak with the person(s) researching the dispute so that she could provide additional information directly to that individual.
77. Instead, the Plaintiffs received different information from multiple agents during their calls to attempt to understand the dispute process and ensure that Freedom had the relevant information regarding the payment at issue.
78. This was frustrating and kept the Plaintiffs from resolving the Defendant's errors.
79. None of the agents whom the Plaintiffs spoke with would elevate their call to management or someone at Freedom who could assist them and resolve the problem.

80. Instead, the Plaintiffs were told that they would receive written notification from Freedom with the dispute results.

81. On Wednesday, May 16, 2018, Ms. Manos called Freedom again and finally spoke with a Freedom "Supervisor" about the status of their dispute.

82. The Supervisor informed Ms. Manos that, based on his opinion, their dispute would be denied because Freedom had attempted to call the Plaintiffs in March about a missed payment.

83. Upon information and belief, the Plaintiffs had only received solicitation calls from Freedom to refinance; the only call the client answered was a solicitation call.

84. Moreover, the Defendant only attempted to contact Ms. Manos by phone, never attempting to call Mr. Manos, though it had his telephone number.

85. Neither Plaintiff received a voicemail from Freedom regarding a missed payment.

86. The Defendant also has Ms. Manos' email address and never contacted her by email concerning a missed payment.

87. That same day, May 16, Ms. Manos sent an email sent to Freedom containing the documentation of screenshots of both her saved and deleted voicemail history showing the Plaintiffs did not receive a voicemail from Freedom at any point in March 2018.

88. The Plaintiffs included an explanation of the documentation that was included.

89. On or around Tuesday, May 22, 2018, the Plaintiffs received a letter from Freedom stating it had received the Plaintiffs' inquiry regarding their account on March 8, 2018.

90. The letter also stated that Freedom was unable to honor the Plaintiffs' request to update their credit reports.

91. Freedom stated that the March 2018 delinquency was accurate as reported and the contractual obligation is to make a full payment monthly on the first of each month.

92. Freedom also stated it was unable to honor a request for courtesy credit report retractions.

93. On Tuesday, June 12, 2018, the Plaintiffs submitted disputes to Equifax, Experian, and TransUnion and copied Freedom. All were sent via certified mail with the United States Postal Service.

94. The dispute included a letter which explained the situation in great detail.

95. On June 12, 2018, the Plaintiffs also submitted a complaint with the Consumer Financial Protection Bureau (CFPB) electronically via CFPB's website.

96. This complaint contained a narrative and two attachments:

   a) A Google Chrome history showing Ms. Manos submitted the mortgage payment on March 6, 2018; and,

   b) A Word document showing the name of the Freedom employee to whom Ms. Manos spoke in May who told her that Freedom's business records showed she submitted the mortgage payment in March but "it didn't go through."

97. On or about Thursday, June 21, 2018, the Plaintiffs received a letter from Freedom regarding the disputes they sent on June 12, 2018.

98. The letter from Freedom was almost identical to the letter Freedom sent to the Plaintiffs on or about May 22, 2018.

99. On Tuesday, June 26, 2018, Freedom responded to the Plaintiffs' CFPB complaint.

100. In the response to the CFPB complaint, Freedom stated:

> Our records indicate that you attempted to make the March payment on March 6th at 11:27 P.M. and dated the transaction for March 6th. Since the payment was attempted after 11:00 P.M. and dated March 6th, the payment was not accepted * * * had the transaction been dated 3/7, the payment would have been accepted.

101. If Freedom had accepted the payment dated March 6, the Plaintiffs would not have been delinquent.

102. On Tuesday, June 26, 2018, Mr. Manos received the reinvestigation result from his Experian dispute dated June 12, 2018. The confirmation number for the dispute report is #1140-1272-60.

103. The Dispute result shows "ND" for "no data" for the March, 2018, payment to Freedom.

104. This was inaccurate and derogatory to the Plaintiffs' credit score.

105. On Wednesday, June 27, 2018, the Plaintiffs received a disheartening email from their mortgage broker, Mike Ray (Ray). Ray informed the Plaintiffs that they were no longer eligible for the pre-approved, jumbo loan due to the significant drop in their credit scores due to Freedom's reporting.

106. Moreover, the Plaintiffs' maximum loan amount dropped significantly.

107. Ray stated in his email, "If we can get scores and history updated, with a score over 700 and no 30 day late reported in credit, then we can increase the loan amount back to non-conforming amount."

108. On Monday, July 2, 2018, the Plaintiffs drafted a second submission to Experian, as Experian rejected the first dispute due to the Plaintiffs only providing the last four digits of their Social Security numbers and not the whole nine-digit number.

109. On Tuesday, July 3, 2018, both Plaintiffs mailed that dispute to Experian via certified mail.

110. On or around Friday, July 6, 2018, Ms. Manos received her dispute results from Equifax. The confirmation number for that dispute is # 8170047089.

111. The Equifax results concluded that Freedom account history with status code "#1 on 3/2018" had been verified as accurately reported.

112. Status code #1 means that the account is 30-59 days past due.

113. Otherwise Equifax stated that Ms. Manos' addresses were updated.

11

114. That report was inaccurate.

115. On or around Saturday, July 7, 2018, the Plaintiffs received their dispute results from the TransUnion dispute that was filed on June 12, 2018. The confirmation number for Mr. Manos' dispute is # 314870550 and Ms. Manos' dispute number is #321816663.

116. The TransUnion results concluded that when the Freedom account reported "maximum delinquency of 30 days in 3/2018" it had been reported accurately.

117. That report was inaccurate.

118. On Tuesday, July 31, 2018, Mr. Manos received the dispute results for his second Experian dispute which was filed on June 3, 2018. The confirmation number for that dispute is # 0336-1664-84.

119. In the dispute results, Experian reported that there was "no data" for the time period of March 2018.

120. This report is incorrect.

121. During August, 2018, Ms. Manos received the dispute results for her August 1, 2018, dispute with Experian. The confirmation number for that dispute is #3423-1740-46.

122. The dispute result stated that the Freedom Mortgage Corp information was accurate; information unrelated to dispute was updated.

123. This report was inaccurate.

124. On Wednesday, August 8, 2018, the Plaintiffs closed on their home loan.

125. At that time their credit scores were still under the 700 mark and the 30-day late report was still on their credit history.

126. Because of this inaccurate, negative reporting by Defendant the maximum loan the Plaintiffs were approved for was $453,100.00.

12

127. The Plaintiffs were originally approved for $560,500.00 prior to the inaccurate, negative reporting.

128. On Friday, December 28, 2018, the Plaintiffs' submitted another dispute via certified mail to each credit reporting agency, Equifax, Experian, and Transunion.

129. These disputes that were filed with Equifax, Experian, and Transunion included a detailed letter, the Google Chrome web browser history showing the payment submission on March 6, 2018, and the letter provided by Freedom to the Plaintiffs in response to the CFPB complaint.

130. The Plaintiffs also copied Freedom on their second dispute to Equifax, Experian, and Transunion.

131. Upon information and belief, Plaintiffs' credit reports and files have been obtained from Defendant and various Credit Reporting Agencies, and have been reviewed by prospective and existing credit grantors and extenders of credit, and the inaccurate information has been a substantial factor in precluding Plaintiff from receiving credit offers and opportunities, known and unknown, and from receiving the most favorable terms in financing and interest rates for at least one credit offer that was ultimately made.

132. The information published about the Plaintiffs' credit worthiness is inaccurate because it implies that the Plaintiffs are irresponsible and paid their mortgage late.

133. The Plaintiffs' mortgage payment was late solely due to Freedom's actions and Freedom should not have published information that implied or stated otherwise.

134. As a result of Defendant's conduct, Plaintiffs have suffered actual damages and considerable financial and pecuniary harm arising from monetary losses relating to credit denials, reduced credit limits, loss of use of funds, loss of credit and loan opportunities and out-of-pocket expenses including, but not limited to, time spent away from their paid

employment to correct the errors of the Defendant and attorney fees, all of which will continue into the future to Plaintiffs detriment and loss.

135. Specifically, the Plaintiffs suffered the following economic damages:

   a) Because of the undeserved limit of their borrowing ability, Plaintiffs had to acquire an extra $107,400 to secure the requested loan. The Plaintiffs were relegated to drafting from retirement accounts and seeking money from a relative, which caused additional costs and humiliation.

   b) The Plaintiffs incurred the higher interest rate 4.750% instead of the 4.625% they should have paid on their home loan.

   c) The Plaintiffs had been offered a loan of $560,500. This credit was reduced to $453,100 after the inaccurate, negative account reporting.

136. As a result of Defendant's conduct, Plaintiffs have suffered emotional and mental pain and anguish, and they will continue to suffer the same for an indefinite time in the future, all to their detriment and loss.

137. As a result of Defendant's conduct, Plaintiffs have suffered actual damages in the form of financial and dignitary harm (for example, decreased credit limit and embarrassment in front of their lender) arising from the injury to credit rating and reputation, and they will continue to suffer the same for an indefinite time in the future, all to their detriment and loss.

138. As a result of Defendant's conduct, Plaintiffs have suffered a decreased credit score as a result of the misreported trade lines and multiple inquiries appearing on their credit file.

139. At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

140. At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of the Plaintiffs herein.

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

141. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

142. Freedom was properly noticed by the Plaintiffs that the Plaintiffs were not delinquent on their mortgage payment as it was reporting to the CRAs.

143. This notice came after the CRAs noticed Freedom of the same inaccuracies on the Plaintiffs' credit reports.

144. Freedom had in its records all of the information relevant to the Plaintiffs' account and chose to report the Plaintiffs as delinquent on their mortgage payment when Freedom knew that the Plaintiffs had paid on time.

145. Freedom knows that the information it is reporting about the Plaintiffs is inaccurate.

146. Plaintiffs contacted Equifax, TransUnion and Experian repeatedly to dispute the accuracy of the information being reported about them.

147. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), Freedom received notification of this dispute from Equifax, TransUnion and Experian.

148. Freedom has repeatedly failed to conduct a reasonable investigation into the accuracy of information related to the disputed trade lines, in violation of 15 U.S.C. § 1681s-2(b)(1).

149. Notwithstanding Freedom's actual knowledge that Plaintiffs were not delinquent on their mortgage payment, Freedom's failure to conduct a reasonable investigation of the accuracy of

its reporting of this adverse information shows an intentional and reckless disregard for Plaintiffs' rights under the FCRA.

150. In addition to the violation as described above, Freedom failed to satisfy its duty under 15 U.S.C. § 1681s-2(b) of updating incomplete or inaccurate information it had previously reported to CRAs upon receipt of each notice from Equifax, TransUnion and Experian that Plaintiffs disputed the accuracy of the previously reported information.

151. Any delinquency in the Plaintiffs' account was due to Freedom's conduct and purposely inaccurate accounting system and not due to financial irresponsibility on behalf of the Plaintiffs.

152. The information that Freedom had furnished to the CRAs to be published was false, and Freedom knew it was false.

153. This information showed the Plaintiffs to be irresponsible consumers when they are not.

154. Freedom's failure to report that Plaintiffs disputed the accuracy of the trade line was a failure to accurately update the information because it was misleading in such a way and to such an extent that it could be expected to have an adverse effect on Plaintiff. *See Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

155. As a direct and proximate result of Freedom's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiffs have suffered substantial loss and damage as described herein, entitling them to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

156. Freedom's indifference as to its obligations under the FCRA reveals a conscious disregard of the rights of Plaintiffs, and the injuries suffered by Plaintiffs are attended by circumstances

16

Case 3:19-cv-00578   Document 1   Filed 10/28/19   Page 16 of 19

of fraud, malice, and reckless, willful and wanton misconduct, calling for an assessment of punitive damages against Freedom, pursuant to 15 U.S.C. § 1681n(a)(2).

## **VIOLATIONS OF N. C. Gen. Stat. § 75-1.1**

157. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

158. Freedom violated N. C. Gen. Stat. § 75-1.1 by the following acts:

   a) Freedom rejected the Plaintiffs' mortgage payment when it would have been made on time.

   b) Freedom did not draft the Plaintiffs' mortgage payment when it had permission and the ability to do so thereby making the Plaintiffs delinquent.

   c) Freedom did not make certain that the Plaintiffs knew their payment had not been accepted even though the Plaintiffs clearly intended for Freedom to receive the timely mortgage payment.

   d) Freedom maintains an unpublished internal policy of rejecting a payment made during the hour between 11:00pm and 12:00am unless the payment is post-dated.

   e) Freedom charged the Plaintiffs penalty fees based on the delinquent payment.

   f) Freedom published information intended to put the Plaintiffs in a bad light with respect to their credit history and ability to make their mortgage payments on time.

159. Such allegations are sufficient to satisfy the unfair or deceptive act requirement of an unfair or deceptive trade practices claim. *See, Nance v. Citimortgage, Inc.,* No. 1:13CV1062, 2014 U.S. Dist. LEXIS 108871, at *11-12 (M.D.N.C. Aug. 7, 2014).

160. Freedom's acts were unfair and deceptive as demonstrated herein.

161. Freedom's acts were in, or affected, commerce as stated herein.

162. Freedom's acts proximately caused the injuries listed herein to the Plaintiff.

163. The injuries suffered by Plaintiffs are attended by circumstances of fraud, malice, and/or willful and wanton misconduct, calling for statutory damages of the actual damages plus treble damages pursuant to N.C. Gen. Stat. § 75-16 as well as attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.1.

## VIOLATIONS OF N. C. Gen. Stat. § 75-50, *et seq*.

164. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

165. Freedom reported to several Credit Reporting Agencies that the Plaintiffs were delinquent in their mortgage payments when the delinquency was the fault of Freedom.

166. This damaged the Plaintiffs' economic reputation and caused damages as described herein.

167. This behavior constitutes a specific violation of N.C. Gen. Stat. § 75-51(3).

168. This behavior constitutes a specific violation of N. C. Gen. Stat. § 75-54(4).

169. Freedom caused the Plaintiffs to be falsely delinquent on their mortgage payment and thereby charged the Plaintiffs with penalty fees.

170. This behavior constitutes a specific violation of N. C. Gen. Stat. § 75-55(2).

171. The injuries suffered by Plaintiff are attended by circumstances of fraud, malice, and/or willful and wanton misconduct, calling for statutory damages of the actual damages plus civil penalties pursuant to N.C. Gen. Stat. § 75-56 as well as attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.1.

## DEMAND FOR JURY TRIAL

172. Plaintiffs exercise their right to a trial by jury on all issues so triable.

**WHEREFORE,** the Plaintiffs respectfully request the following relief from the Court:

18

Case 3:19-cv-00578  Document 1  Filed 10/28/19  Page 18 of 19

1. Compensatory damages against the Defendant in an amount to be determined at trial that will fairly and reasonably compensate them for the emotional distress, aggravation, annoyance, humiliation, and financial hardship suffered as a result of the Defendant's unlawful acts;

2. Punitive damages against the Defendant in an amount to be determined at trial for the willful, wanton and/or reckless disregard for their legal rights;

3. Actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o;

4. Statutory damages, an assessment of punitive damages against Defendant, plus attorneys' fees and costs pursuant to 15 U.S.C. § 1681n;

5. Actual damages to be determined at trial and statutory damages of $4,000 per violation as allowed pursuant to N. C. Gen. Stat. §75-50, et seq.;

6. Costs and reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 75-16.1 and 75-50, *et seq.*;

7. And for such further and relief that this Court may deem just, equitable and proper.

**TODAY** is October 28, 2019.

**COLLUM & PERRY**

By: */s/ M. Shane Perry*
M. Shane Perry
NC Bar Number: 35498
109 W. Statesville Ave.,
Mooresville, NC 28115
Telephone: 704-663-4187
Facsimile: 704-663-4178
shane@collumperry.com
*Attorney for Plaintiffs*