## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO. 3:19-CV-578

**PAUL MANOS AND MARGARET M.
MANOS,**

**Plaintiff,**

v.

**FREEDOM MORTGAGE
CORPORATION,**

**Defendant.**

**RESPONSE TO MOTION
FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiffs Paul and Margaret Manos, by and through counsel, and hereby

responds to the Defendant's motion for summary judgment. In support of this response the

Plaintiffs respectfully show this Court the following:

### STATEMENT OF FACTS

This case is a simple one. The Plaintiff, Mrs. Manos, attempted to pay her mortgage after

11:00 pm on March 6, 2018. What she did not know was that Freedom Mortgage Corporation

(Freedom) had a policy in place that if she made her mortgage payment after 11:00 pm, she had

to post-date the payment. Freedom had never told her this; it is not in any documentation it

provides its client. It is not on its website. It is not stated on the mortgage statements it sends to

its clients. It is not in any email notice. It is not in any advertisements. Freedom literally never

tells the clients in advance that it will reject a payment made after 11:00 pm if the payment is not

post-dated:

> Q. "...what should a person do who's making a payment after 11:00 p.m.?
> A. A person who's making a payment after 11:00 p.m., if they don't want their
> payment to post the next day, should make their payment before 11:00 p.m. If
> they make a payment after 11:00 p.m. and they receive that error message, they
> need to provide authorization for Freedom to withdraw those funds on the

following day, which would be, in this instance, on the 7th, then those pay -- those funds can be received and that payment can be posted.

Q. Okay. So – but I haven't heard you yet say that it's Freedom's policy that a payment should be postdated after 11:00 p.m.· Is it Freedom's policy that a payment must be postdated after 11:00 p.m.?

A. It's Freedom's policy that all payments must be received before 11:00 p.m. if they are making a web portal payment in order for that payment to be posted that same day.

Q. Okay. And I'll ask again, is it Freedom's policy that a payment made on their portal after 11:00 p.m. must be postdated to the next day?

A. It's Freedom's policy that if – it is payment made after 11:00 p.m. on the day that they are attempting to make that payment, they must submit their payment or post their -- postdate their payment in order for that payment to be posted and received that day. But we have to receive authorization from the consumer authorizing us to withdraw those funds the next day.

* * *

Q. Okay. How is the customer alerted to that policy?

A. When you say how is the customer alerted to that policy, again, it says on our website, any payments made after 11:00, we post it the next day. It also says that you'll receive an error message when you try to attempt to make a payment after 11:00 p.m. It rejects the payment and tells you that you have to post it for the next day; you have to change the date to post for the next day.

*Deposition of Tanya Tarver*, pp. 34:20-35:24, 36:9-36:18. (Exhibit A). The witness should not have said, "It also says that you'll receive an error message…" because the Defendant's website definitely does not say that the customer will receive an error message and never has.

Q. Okay. Do you have any way to ensure that the customer knows this policy?

MR. BERRY: Objection. Vague and ambiguous. What do you mean by the customer knows?

Q. (Mr. Perry) Do you want the customer to know that this is your policy?

A.· ·The customer knows that that's the policy when they receive the error message. The customer also receives information as to how they can make their payments, when they get their statement, as well as we provide a welcome letter to each customer advising the different ways to make their payments, and how to make their payments.

Q. Right. But we're speaking specifically about the policy that the customer must postdate the check – or the payment, excuse me, the payment – or whatever, they must be postdate it to the next day if it's made after 11:00 p.m.· Do you have any way to ensure that the customer knows about that policy?

A. Again, when they go on our web portal to submit their payment, if it's paid -- submitted after 11:00 p.m., they receive an error message telling them that their payment cannot be submitted on this day because it's after 11:00 p.m.

Q. Okay. Is there any notice of that policy income prior to that payment?

2

A. On our statements that go out, it says, "All payments must be made by 11:00 p.m.," or they'll post the next day.

Q. That's correct. But is there anywhere in any of your notices to your clients that they must postdate a payment made after 11:00 p.m.?

A. I'm not sure I understand the question, because I just said our statements that show that all payments must be made by 11:00 p.m. or the payment should be posted the next day. I've also testified that if they are making a payment on our web portal, that -- and it's before 11:00 p.m., that payment is posted that same day once the funds are received. If it is made after 11:00 p.m., and they are trying to post it for that same day, they will receive an error message advising them that their payment cannot be made because it is after 11:00 p.m. and that they would have to post it for the next -- give us authorization for that, during the next day.

Q. Right. So – and my question is, regarding the policy of post-dating the payment, is there anywhere that you have noticed your clients about the post-dating policy prior to the time when they're making the payment?

MR. BERRY: Objection. Asked and answered. Ms. Tarver, you may answer.

THE WITNESS: I don't know.

*Id*, 36:19-36:21. Freedom does, however, tell its clients that the payment *will* post the next day. "[I]t says on our website, any payments made after 11:00, we post it the next day" *Id.* It tells them on the mortgage statement that the payment *will* post. *Id.* It tells them on the website where clients make their mortgage payments that it *will* post. *Id.* It tells them in paperwork that it gives its clients that the payment *will* post, but never advises them about any possibility of rejection. "Q. In this Payment Information block, do you see anything that advises the customer that if they make a payment after 11 o'clock at night, it must be postdated to the next day to be accepted? A. I do not." *Id.*, p 41:18-23.

So, a client making a payment after 11:00 pm will know that the payment will be credited the next day, but they will not know that it will not be credited at all. If this sounds confusing, that is precisely why this case should be sent to a jury.

Freedom's response is that there is an error message that tells the client that their payment did not go through if the payment was made after 11:00 pm and not post-dated. When asked, Freedom could not say what that error message looked like; what type and size font, what

3

color the font was, how much of the screen the message covered or whether Mrs. Manos had a

popup blocker engaged:

> Q. Okay. Are error messages Freedom's primary way of notifying a customer of an ACH payment policy?
> A. I'm not sure how to answer that.
> Q. Okay. Is there another way that Freedom would notice the -- excuse me, the Manoses of ACH payment policies?
> A. Not -- not that I'm aware of.
> Q. Okay.· So the error message, is that a pop-up?
> A. Yes.
> Q. Okay. So I want to ask you some questions about that pop-up specifically. Are you familiar with the screen as it looks when a customer is making a payment?
> A. Yes.
> Q. Okay. And are you familiar with what that pop-up looks like, the error message pop-up that the Manoses were supposed to have received?
> A. Yes.
> Q. Okay. So what color is the screen that the customer sees when the error message is displayed?
> A. I would have to go back and look at the images provided.
> Q. Okay. What color is the text of the error message?
> A. I'd have to look at the -- at the error message displayed.· We've changed our website and it's been a few years, and I don't want to answer incorrectly.
> Q. All right. So is it fair to say that you would not know the font of the text in the error message or was the ---
> A. Not without -- not without looking at the example provided, correct.
> Q. Do you know how long the pop-up would stay on the screen?
> A. I do not know the exact time.
> Q. Can you guess within a couple of seconds or a minute or so?
> A. I believe the borrower or customer has to close out of it to get it to go away.
> Q. Okay. Does the error message, the pop-up; does it disappear if there's no interaction with it?
> A. I do not believe so.
> Q. All right. Do you know what percentage of the screen the pop-up covers?
> A. No.
> Q. Okay. Is there a sound associated with the pop-up?· Does it make a noise?
> A. No.
> Q. Does the error message require any interaction by the customer to continue interacting with the page?
> A. They -- they have to close the error message.
> Q. Okay. So to continue interacting with the page you would have to close the error message?
> A. Yes.
> Q. Does it require interaction with the error message, the pop-up, to close the payment screen all· together?

4

A. They have to exit out of the website.

\* \* \*

A Just closing their browser.

Q. All right.· Does your system create any type of log that tells you if the user acknowledged the error message?

A. Our system generates a log that notifies us an error message was presented.

Q. Is there a requirement -- at the time that the Manoses were using this, was there a requirement that the user, the customer, the Manoses, allow pop-ups to be able to use the system?

A. No.

Q Do you know if the Manoses allowed pop-ups or if they blocked them?

A. No.

*Deposition of Amy Grant*, pp. Pp 16:18 – 19:23 (Exhibit B). Freedom testified that it did not require customers to turn off popup blockers. *Id*. A pop-up blocker would have kept Mrs. Manos from seeing the error message for any payment submitted after 11:00 pm. Upon this alone Freedom admits that it cannot prove that Mrs. Manos saw any error message. Freedom said the error message does not make a concomitant alert noise and that the customer can exit the screen without acknowledging the error message. *Id*. In so doing, Freedom admits that the customer could attempt to pay her mortgage and never know it was not accepted because she would never see the error message or hear an alarm telling her there was a problem.

That is, if the error message ever appeared. Freedom insists that it did and Mrs. Manos insists that it did not. This is not a question of law. As far as Mrs. Manos knew, she made her payment and she could exit the screen and go about her business. Certainly, she had the money in her account to cover the payment. Freedom knows that from viewing her bank records. *Defendant's Motion to Dismiss*, p. 11 (Doc 1). Freedom describes reviewing the Plaintiff's bank records. *Defendant's Exhibit H*, (Doc. 28-9). She also has never been 30 days late on any mortgage payment with Freedom or its predecessor; Freedom also knows this. So unless Mrs. Manos was passing the time filling out a mortgage payment without intending to make her payment, Freedom must admit that Mrs. Manos did intend to make her payment.

5

In fact, Freedom admits that Mrs. Manos logged on that night for the purpose of making her payment. "THE WITNESS: Based on my review of our records, yes, Ms. Manos attempted to make a payment on March 6th, 2018." *Deposition of Tanya Tarver*, p. 21:21-23. That is why she entered all of the required information on the payment screen.

Freedom also admits that it rejected the payment Mrs. Manos attempted to make. "Q. [D]id Freedom reject her attempt to make the payment? A. Freedom rejected the payment that Mrs. Manos was trying to make on March 6th, 2018." *Id*., p.22:3-6. If a customer mails her lender a check and the lender throws away that check, the customer still made her payment. That is exactly what happened here, in electronic form. Mrs. Manos filled in the forms, hit send and Freedom rejected the payment.

After all that, Freedom then published to the world that Mrs. Manos is the type of customer who goes 30 days late on her mortgage, when everything it knows about Mrs. Manos says the exact opposite. This is not maximum possible accuracy as required by the FCRA. In fact, it is misleading in that it tells the world inaccurate information:

> If a jury concludes, as it reasonably could, that the report indicates that Dalton was guilty of a felony, inaccuracy would be established because it is undisputed that Dalton pled guilty to a misdemeanor. In short, the evidence in the summary judgment record is sufficient to create a triable issue on the accuracy of the report.

*Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 416 (4th Cir. 2001). If Freedom rejects a payment without telling Mrs. Manos that it did so, based on a policy that she never heard or was notified of in any way, Freedom should not publish to the world that Mrs. Manos was delinquent. "[A] report is inaccurate not only when it is patently incorrect but also when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142, 148 (4th Cir. 2008) (internal punctuation

6

omitted). Mrs. Manos is not the kind of customer who pays late, and Freedom should not report her as such when it rejected her payment.

The Defendant's recitation of facts is troubling in how erroneous it is. It is *well* disputed whether the Freedom website alerts the customer about a post-dating policy. It is also strongly disputed by the Plaintiffs that they altered the February 2018 payment after receiving a notice about post-dating payments. Mrs. Manos said she was not sure why or how that happened, but it certainly was *not* after seeing any error message. "I recall that I was taken to a confirmation screen, and once I saw that, that was sufficient for me." *Deposition of Margaret Manos*, p. 54:23-25. (Exhibit C)

Freedom has proffered some kind of records in an attempt to demonstrate when the Manoses logged into the system and what was displayed, but they defy analysis or meaning and prove nothing. *Defendant's Exhibit F* (Doc. 28-7). Even if they did, it is the province of the trier of fact to decipher these esoteric documents. And the evidence is not reliable anyway, since there is no chain of custody for the Defendant's evidence. "Q. I was hoping to ask you questions about that information, where it was stored. Do you know if there is a policy for chain of custody for information stored on computers? A. I do not know that." *Deposition of Amy Grant*, p. 21: 15 – 19. Amy Grant was the Defendant's 30(b)(6) witness who was made available to answer questions of a technical nature. If she does not know, Freedom does not know, since she speaks for Freedom. *See, United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C.), aff'd, 166 F.R.D. 367 (M.D.N.C. 1996).

Moreover, while the Plaintiffs admit they received many letters from Freedom, including a lot of unwanted junk mail, they did not see any letter alerting them that the March 2018 payment was not received in time to correct Freedom's mistake. Freedom now claims that it

7

attempted to call the Plaintiff seventeen times. Freedom cannot state the content of any calls because Freedom only left one message, and that was after the March 2018 payment was already delinquent. *Defendant's Exhibit M* (Doc. 28-14). Freedom cannot prove that any of those previous calls were for anything other than marketing purposes. Certainly, Freedom could have left a message in any of the sixteen calls it made prior to the payment going delinquent. Freedom calls these phone calls "notifications." *Defendant's Motion for Summary Judgment,* p. 6 (Doc. 28-1). A phone call where no information was conveyed, not even a hello, cannot possibly be called a "notification." Freedom noticed the Plaintiffs of nothing by phone.

While it is true that, during a telephone call with Freedom, Mrs. Manos used the words "I'm not trying to dispute that… it's my fault I missed it," (*Defendant's Motion for Summary Judgment,* p. 6 (Doc. 28-1)), those words *in context* demonstrate a different meaning than the Defendant demands, and this is exactly why a trier of fact is required to determine that meaning. The same can be said for Mrs. Manos' statement "I missed the day obviously, I don't think that is in dispute." *Defendant's Motion for Summary Judgment,* p. 7 (Doc. 28-1). Clearly the payment was not credited, so she missed the payment. That is why she used those words. But she was not admitting that it was her fault she missed the payment and she will tell the trier of fact the same. Her testimony as to her intent must be considered by a jury, and not read in the flat aspect of a document as a matter of law.

The Defendant continually states that the Plaintiffs "did not make her March mortgage payment." *Defendant's Motion for Summary Judgment,* p. 7 (Doc. 28-1). This is exactly opposite of the Plaintiffs' testimony, the evidence, and Freedom's own admissions. The Plaintiff clearly made her payment on time. That payment was rejected by Freedom for a policy which it admits

it never notified the Plaintiff of, other than a pop-up notice that it also admits it cannot know if the Plaintiffs received it.

Mrs. Manos did request that Freedom not report her 30 days late on her credit report. This was an opportunity for Freedom to ameliorate its damages and it chose not to, despite it being in the wrong. Whether the Plaintiffs checked to see if their payment was received does not alleviate the Defendant's requirement to apply payments made. 15 U.S. Code § 1639f(a) states that "no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency[.]" *Id.* As a mortgage lender, Freedom must apply payments and the Manoses were not required to check up on the bank to make sure it followed federal law. No reasonable person would expect the bank to reject a mortgage payment for an unknown policy when the customer is trying to give the bank money for her mortgage payment. In this case, because Freedom rejected the payment that the Manoses attempted to make, it therefore could not report its own failure to properly credit the payment as the Manoses going late.

The question of damages has not been raised, but both Paul and Margaret Manos testified extensively about their damages caused by Freedom's actions.

## STANDARD OF REVIEW

In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)). In considering motions for summary judgment, "The evidence must be viewed in the light most favorable to the non-moving party." *Smith v. Virginia Commonwealth Univ.*, 84

9

F.3d 672, 675 (4th Cir. 1996). "The plaintiff is entitled to have the credibility of all his evidence presumed." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied*, 498 U.S. 1109 (1991). "The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, (1986). This is in keeping with "the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (*citing Conley v. Gibson*, 355 U.S. 41, 48 (1957)). If there is adduced any evidence that supports the Plaintiff's claim, the Plaintiff has the right to be heard by the trier of fact.

> Where the party opposing summary judgment would have the burden of proof at trial, that party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered."

*Gordon v. Kidd*, 971 F.2d 1087, 1093-1094 (4th Cir, 1992) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

## STATEMENT OF THE LAW

In the case at bar all of the material facts averred by the Defendant are contradicted by facts averred by the Plaintiffs. The *Anderson* Court held that "the requirement [for summary judgment] is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. 242, 247–48. (Emphasis in the original.) In this case there are many genuine issues of material fact that are strongly contested.

The Defendant makes a rather bold statement that the Plaintiffs have "failed to adduce any facts supporting material elements of their claims." *Defendant's Motion for Summary Judgment*, p.9 (Doc. 28-1). After thousands of pages of discovery and four depositions between the parties, the jury will have copious evidence supporting the facts of this case that it must parse

10

out. This is not a case that is properly dismissed on summary judgment. In fact, the evidence of this case will demonstrate that the Plaintiffs should be granted summary judgment on causation, when the standards of *Anderson* and *Lujan* are applied.

<u>Freedom's investigation was unreasonable:</u>

Pursuant to 15 U.S.C. § 1681s-2(b)(i) Freedom reported that the Plaintiffs did not make their payment on time. This is inaccurate by their own admissions. Freedom chose not to credit a payment that *was* made on time. Then Freedom chose to publish to the world that the Manoses are the kind of people who don't make their mortgage payments on time. This was simply untrue. When the Manoses disputed this trade line, Freedom's investigation should have determined that the trade line was inaccurate, yet it did not. Clearly the investigation was not reasonable if it came to the wrong conclusion. We know this because 15 U.S. Code § 1681s–2(b)(1)(E) requires that:

> if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation [the Furnisher must] promptly (i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information.

*Id.* Those are the requirements of the reinvestigation, same as the requirement to review the relevant information provided by the consumer reporting agency (15 U.S.C. § 1681s-2(b)(1)(B) or to report the results of the reinvestigation as required by 16 U.S.C. § 1681s-2(b)(1)(C).

In its motion for summary judgment, Freedom simply recited the steps in its reinvestigation. *Defendant's Motion for Summary Judgment*, p.14-15 (Doc. 28-1). Because the process for reasonably investigating disputes is not described in any statute, the Court cannot determine as a matter of law that the process was reasonable. It is necessarily a factual determination. But we do know that "[a] consumer challenging a furnisher's reinvestigation

11

efforts must show that the furnisher failed to act with a 'degree of careful inquiry' to ensure accurate information." *Kelly v. SunTrust Bank*, No. 3:14-CV-121, 2016 WL 775781, at *4 (E.D. Va. Feb. 25, 2016), *aff'd*, No. 16-1310, 2016 WL 7030641 (4th Cir. Dec. 2, 2016) (*citing Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004)). Accordingly, the investigation must produce accurate information, or it is not a reasonable investigation. The trier of fact must determine if the information produced by the Defendant was accurate. Moreover, the investigation did not include speaking to the Plaintiffs or inquiring in any way why they feel the reported information is incorrect. The investigation is facially incomplete if the customers disputing the published information are not contacted about the reported information. The Defendant does not get to run a shoddy investigation and this is what any reasonable investigator does: contact all the parties involved.

The Defendant states that "Freedom's account notes show that no payments were received in March of 2018. * * * Thus it is undisputed that Plaintiffs did not make their March 2018 payment in March of 2018." *Defendant's Motion for Summary Judgment,* p. 11 (Doc. 28-1). This is simply wrong and does not follow logically. Freedom *rejected* the Manoses payment. Freedom's own testimony shows that the Manoses entered information in the Freedom website for the purpose of making the payment. Freedom cannot blame the Manoses for not making a payment it rejected.

Freedom cites two cases relating to the reasonableness standard *Miller v. Trident Asset Mgmt., LLC.*, No. CV ADC-18-2538, 2019 WL 6528610, at *1 (D. Md. Dec. 4, 2019) and *Chiang v. Verizon New England Inc.*, 595 F.3d 26 (1st Cir. 2010). *Miller* is a District case from Maryland about a serial filer who lied to the court and abused the system. *Chiang* is a first Circuit case which has not been cited by the Fourth Circuit or this District and for good reason. It

12

has received negative treatment in several courts including the Fifth Circuit. But in the end, "The issue of whether the agency failed to follow reasonable procedures will be a "jury question in the overwhelming majority of cases." *Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 416 (4th Cir. 2001) (internal punctuation omitted).

> It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute[.] [A] plaintiff need only "minimally present some evidence" of unreasonableness. This case is easily grouped within the "overwhelming majority of cases."

*Id*, (citations omitted and some punctuation supplied). Specifically, the Manoses have created a dispute of material fact as to whether it was accurate to publish false information about the Manoses and whether a reasonable investigation would have found it proper to continue publishing false information; that false information being that the Manoses do not pay their mortgage payment on time when they clearly attempted to do the same. This is the current binding precedence in the Fourth Circuit and should have been part of the Defendant's brief.

The Defendant makes the strange claim that "Freedom has adduced uncontroverted evidence concerning the reasonableness of its investigation." *Defendant's Motion for Summary Judgment*, p.14 (Doc. 28-1). There is a lot of contrary evidence, not the least of which is the Defendant's own record. An investigation is patently unreasonable when it concludes that the Manoses should be reported as the kind of debtor who pays late when the clear evidence shows the Manoses following the instructions they were given to make a payment on time. It is not as if the facts were hidden and the investigation was difficult. Freedom only needed to look into its own records to know. The investigation should have shown the very opposite of Freedom's conclusion. And whether this investigation was reasonable is a question for the jury in the

overwhelming majority of cases. Certainly, an investigation procedure that is not codified in any law cannot be held to be reasonable as a matter of law. That would be preposterous.

When considering any part of the Defendant's motion to quash the Plaintiff's right to a trial, this Court is guided by a strong principle:

> The FCRA is designed to protect consumers from inaccurate information in consumer reports by establishing credit reporting procedures which utilize correct, relevant and up-to-date information in a confidential and responsible manner; accordingly, the Act must be liberally construed in support of that purpose.

*Saunders v. Equifax Info. Servs., L.L.C.*, 469 F. Supp. 2d 343, 356 (E.D. Va. 2007), *aff'd sub nom. Saunders v. Branch Banking And Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008). "These consumer-oriented objectives support a liberal construction of the FCRA." *Freckleton v. Target Corp.*, 81 F. Supp. 3d 473, 481 (D. Md. 2015) (internal citations and punctuation omitted). This refrain is repeated: "These consumer-oriented objectives support a liberal construction of the FCRA." *Frazier v. RJM Acquisitions LLC*, No. CIV. WDQ-14-0047, 2015 WL 795078, at *3, n.6 (D. Md. Feb. 24, 2015). When there are competing sets of facts to determine the reasonableness of an investigation, a liberal construction allows the trier of fact to determine the outcome.

<u>Freedom is a debt collector</u>:

Another bizarre claim made by Freedom boils down to the idea that Freedom, as a debt collector, is not restricted by North Carolina's debt collection statutes, making it immune to a § 75-50, *et seq*., collection lawsuit. That cannot be the case, as no reasonable society would allow a debt collector to operate with impunity. "In North Carolina, the NCDCA constitutes the sole remedy for unfair and deceptive trade practices in the context of debt collection." *Polanco v. HSBC Bank USA Nat'l Ass'n*, No. 3:17-CV-00466-GCM, 2019 WL 2590964, at *6 (W.D.N.C. June 21, 2019). Polanco was a debt collection and mortgage servicing abuse case against a

14

mortgage servicer. *See*, *Musenge v. SmartWay of the Carolinas, LLC*, No. 3:15-CV-153-RJC-DCK, 2018 WL 4440718, at *5 (W.D.N.C. Sept. 17, 2018).

To support its claim, Freedom cites a statute that applies to *third party* debt collectors, the Fair Debt Collection Practices Act (FDCPA). This is inapposite. Freedom makes this comparison because, unfortunately, the same improper comparison was made in *Brown v. Loancare*, LLC, No. 3:20-CV-00280-FDW-DSC, 2020 U.S. Dist. LEXIS 236846 (W.D.N.C. Dec. 16, 2020). Freedom cited *Brown* for the proposition that "mortgage loan servicers like Freedom are not 'debt collectors' under the NCDCA." *Id*, at *6.

The Fourth Circuit has already weighed in and found that a consumer can sue a mortgage servicer under N.C. Gen. Stat. § 75-50, *et seq*. "Ross's unfair debt collection practices claim survives preemption." *Ross v. F.D.I.C*., 625 F.3d 808, 810 (4th Cir. 2010). The *Ross* Court then analyzed the § 75-50, *et seq.,* claims against the mortgage lender. This is controlling.

But in the interest of addressing *Brown*, it is important to note that the Manoses debt to Freedom was past due, according to the Defendant. That is why Freedom reported the Manoses as 30 days late. Assuming *arguendo* that Freedom's argument is true, the NCDCA applies:

> We hold that defendant, in seeking to recover past due rent and related charges, is a debt collector as defined under the NCDCA, Article 2, § 75–50. This Court has previously held that, "Chapter 75 applies to residential rentals because the rental of residential housing is commerce pursuant to § 75–1.1." Thus, defendant is subject to all provisions of Chapter 75, including Article 2, § 75–56,

*Friday v. United Dominion Realty Tr., Inc*., 155 N.C. App. 671, 677 (2003) (citations omitted). Freedom forgot to mention that when discussing *Brown*, which cites *Friday*.

But that does not fix the problem of the *Brown* case. The analysis is wrong and ignores the plain language of the statute. N.C. Gen. Stat. § 75-50(3) states that "'Debt collector'" means any person engaging, directly or indirectly, in debt collection from a consumer except those

15

persons subject to the provisions of Article 70, Chapter 58 of the General Statutes." *Id*. *Any person* is the start of this analysis, and "any person" includes the Defendant. However, we must proceed to Chapter 58 to continue the analysis. N. C. Gen. Stat. § 58-70-15(c) states that "'Collection agency' does not include any of the following: * * * (3) Mortgage banking companies." *Id*. This makes perfect sense because § 58-70 controls the activities of third-party debt collectors, the same as the FDCPA. There is no federal analogue of North Carolina's § 75-50, *et seq*. Mortgage banking companies are never third-party collectors. The *Brown* Court was misguided to compare the FDCPA to N.C. § 75-50, *et seq*.

The *Brown* Court further misapprehended the statute. N.C. Gen. Stat. § 58-70-15 (c) states that "Collection agency" does not include any of the following: (2) ...trust companies.... In *Friday*, the defendant was a trust company yet the *Friday* Court held the defendant liable under § 75-50, *et. seq*. A trust company is excluded from the definition of collection agency under § 58, yet because it collects debt it falls under § 75-50, *et seq*. as a debt collector. So says the N.C. Court of Appeals. This kills Freedom's argument that because mortgage bankers are listed in § 58, they excluded from the definition of debt collectors in § 75-50(3). The law is exactly the opposite.

*Brown* has another problem: the Defendant in *Brown* said, and the Court agreed, that the NCDCA does not apply because the Plaintiff was never in default. This is just not correct. The *Brown* Court stated:

> Indeed, the North Carolina Court of Appeals has intimated that "debt collection" under the NCDCA only occurs when a consumer has defaulted on an amount owed. *See Friday v. United Dominion Realty Trust, Inc*., 575 S.E.2d 532, 536 (N.C. Ct. App. 2003) ("We hold that defendant, in seeking to recover past due rent and related charges, is a debt collector as defined under the NCDCA."

*Brown v. Loancare, LLC*, No. 320CV00280FDWDSC, 2020 WL 7389407, at *3 (W.D.N.C. Dec. 16, 2020). The *Brown* Court then cites courts from other states and not one from North Carolina. The N. C. Court of Appeals intimated nothing like this. It simply said that seeking to recover past due rent made it a debt collector. It did not say that the rent being past due was the *sine qua non* of being a debt collector. It did not even hint at it. A review of the case will demonstrate that. The *Brown* Court just got this one wrong.

N. C. § 75(1) defines a Consumer as "any natural person who has incurred a debt or alleged debt for personal, family, household or agricultural purposes." This definition mentions nothing about being past due and such an interpretation flies in the face of the definition of "debt" spelled out in § 75-50(2): "'Debt' means any obligation owed or due or alleged to be owed or due from a consumer." *Id.* "**Any** obligation" includes debt that is not delinquent. In fact, § 75-50, *et seq.*, covers many aspects of debt collection which have nothing to do with being late. § 75-55(1) covers debts that have been discharged and are not owing at all. § 75-55(3) prohibits communicating with a consumer who is represented by counsel. § 75-54(1) prohibits communicating with a consumer using a pseudonym. In fact, almost none of the provisions of § 75-50, *et seq.,* require that the collected debt be past due. And it should be noted that *Brown* is only reported on Westlaw and would not be binding if it were in an official reporter.

Finally, and this is extremely important, this "past due" definition does not help Freedom in the case at bar anyway. The Manoses were paying a debt on time, they felt. Freedom says that their method of collecting debt does not fall under § 75-50, *et seq*. because § 75-50, *et seq*. only pertains to past due debt. So Freedom must be admitting that the debt was not past due. If so, Freedom should not have reported the Manoses as late, because this violated the FCRA. If Freedom says the Plaintiff

17

was in default, then the *Brown* analysis does not apply because the *Brown* analysis says § 75-50, *et seq.,* applies to defaulting consumers. Freedom has painted itself into a corner.

Freedom's method of never telling its customers of its policy and then not applying the customer's payments when they clearly attempt to make the payments is unfair and subject to § 75-50, *et seq*. Freedom's method is set up in a way that, as happened here, a customer's mortgage payment can be rejected based on a hidden rule and fees collected on that missed payment. Further, the customer can be reported as a late payer when they were willing and able and attempted to pay on time. It cannot be more deceptive than to have a secret rule and reject a payment when the customer was never apprised of that rule. And whether the customer was apprised or not is a question of fact for the jury. But again, Freedom has stated that it has no way of knowing if the Manoses were ever made aware of this policy and so it cannot present any evidence to a jury that the Manoses knew.

In their § 75-1.1 claim, the Plaintiffs were also finding fault with Freedom's method of notifying its customers of its procedures. "Freedom did not make certain that the Plaintiffs knew their payment had not been accepted even though the Plaintiffs clearly intended for Freedom to receive the timely mortgage payment." *Plaintiff's Complaint*, para. 158(d). (Doc. 1). 75-1.1 is not limited to debt collection.

§ 75-50, *et seq.*, is not preempted by § 45-90:

The *Brown* Court was similarly misguided to think that N.C. Gen. Stat. § 45-90 *et seq.* somehow supplanted N. C. § 75-50, *et seq.,* simply because it covers mortgage banking. No North Carolina courts have found this to be the case. Yes, the North Carolina General Assembly could have said something in § 45-90 about repealing § 75-50, *et seq.,* as it pertains to mortgage services, but it did not:

18

Repeals by implication are not favored, and statutes dealing with the same subject matter will be reconciled and effect given to all unless some are irreconcilable with others. We are satisfied that, had the legislature desired to treat motorcycles differently from other types of motor vehicles for insurance rate making purposes, it would have done so explicitly and unambiguously, and not by implication as the Commissioner suggests.

*State ex rel. Com'r of Ins. v. N. Carolina Auto. Rate Admin. Office*, 294 N.C. 60, 67, 241 S.E.2d 324, 329 (1978).

A statute is not deemed to be repealed merely by the enactment of another statute on the same subject. The later statute on the same subject does not repeal the earlier if both can stand, or where they are cumulative, and the court will give effect to statutes covering the same subject matter where they are not absolutely irreconcilable and when no purpose of repeal is clearly indicated.

*Person v. Garrett*, 280 N.C. 163, 165 (1971). Federal courts have found the same: "Repeal by implication is not favored in North Carolina." *In re Hare*, 32 B.R. 16 (Bankr. E.D.N.C. 1983). "[R]epeal by implication is a rare bird indeed." *Randolph v. IMBS, Inc*., 368 F.3d 726, 730 (7th Cir. 2004) (citing *Branch v. Smith*, 538 U.S. 254, 273 (2003); *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred International, Inc*., 534 U.S. 124, 141–44 (2001)).

In fact, many cases have come before North Carolina courts where mortgage servicers have been held liable under § 75-50, *et seq.,* after § 45-90 was enacted in 2007. Moreover, "to the extent that the alleged misconduct is outside the NCDCA, the NCDCA does not foreclose a separate [NCUDTPA] claim." *Thompkins v. Key Health Med. Sols., Inc*., No. 1:12-CV-613, 2015 WL 1292228, at *4 (M.D.N.C. Mar. 23, 2015).

These statutes supplement each other. That is the right of the North Carolina General Assembly and they exercised that right. Likewise, the NC SAFE Act,[1] N. C. Gen Stat. § 53-244.010, et seq., governs mortgage collections, and allows a private right of action, but does

---

[1] See https://www.nccob.gov/Public/financialinstitutions/mortgage/MortgageFAQ.aspx for an explanation of what is covered by the N.C. Safe Act.

not supplant § 45-90 or § 75-50, *et seq*. And see, *Sacco v. Bank of Am., N.A.*, No. 5:12-CV-00006-RLV, 2012 WL 6566681 (W.D.N.C. Dec. 17, 2012) a case reported only in Westlaw, but which holds that the National Bank Act of 1864, 12 U.S.C. § 21 et seq., does not preempt § 75-50, *et seq*., for the reasons stated herein. The Defendant's preemption argument fails.

The Late Fee and Unconscionability:

Very simply stated, the Plaintiff is not arguing that it is unconscionable to charge a late fee when a customer is late, but it unconscionable to cause the customer to become late in order to charge a late fee. It is not the fee in question, it is the act of forcing the customer to incur a late fee when she acted properly.

## CROSS MOTION FOR SUMMARY JUDGMENT

While every fact to which Freedom did not admit must be tested by a tier of fact, Freedom did admit to the following:

1. Mrs. Manos attempted to make her payment.
2. Freedom never alerted her to the unusual post-dating policy prior to her making the payment.
3. Freedom rejected her payment.
4. Mrs. Manos may never have seen the error message.
5. Freedom cannot testify that the Manoses saw the error message.

When asked if Mrs. Manos saw the error message, Freedom responded that there is no way it could know this. "Q. Did the Manoses see that, either of the Manoses, whoever was making the payment, did they see that pop up? A. I would not be able to know that." *Deposition of Amy Grant*, p. 28: 4-7. So how can it possibly argue that the Manoses saw the error message? That would contradict its own testimony. If Freedom cannot argue that Mrs. Manos saw the error message, and she testified that she did not, there is nothing for the jury to consider on this matter.

20

For these reasons this Court should grant summary judgment to the Manoses on the matter of causation and the Plaintiffs so move for that relief.

**WHEREFORE**, Plaintiffs respectfully move this Court to DENY the Defendant's Motion for Summary Judgment and order summary judgment for the Plaintiff as requested herein, or for such other and further relief as this Court finds just and proper.

**TODAY** is February 8, 2021

**COLLUM & PERRY**

*/s/ M. Shane Perry*
M. Shane Perry
NC Bar No. 35498
109 W. Statesville Ave.
Mooresville, NC 28115
P: 704-663-4187
shane@collumperry.com
*Attorney for Plaintiffs*

| | |
|---|---|
| PAUL MANOS AND MARGARET M. MANOS,<br><br>       **Plaintiff,**<br><br>   v.<br><br>**FREEDOM MORTGAGE CORPORATION,**<br><br>       **Defendant.** | **RESPONSE TO MOTION FOR SUMMARY JUDGMENT** |

## CERTIFICATE OF SERVICE

   This is to certify that I have this day served a true and correct copy of the foregoing via CM/ECF to the following attorneys of record:

**DINSMORE & SHOHL, LLP**

John J. Berry
*Pro Hac Vice*
1300 Six PPG Place
Pittsburgh, Pennsylvania 15222
P: 412-288-5854
john.berry@dinsmore.com
*Attorney for Defendant*

**DINSMORE & SHOHL, LLP**

Kelly Eisenlohr-Moul
1100 Peachtree Street, Suite 950
Atlanta, Georgia 30309
P: 470-300-5337
kelly.eisenlohr-moul@
dinsmore.com
*Attorney for Defendant*

**DINSMORE & SHOHL, LLP**

David A. Zulandt
Dinsmore & Shohl, LLP1001
Lakeside Avenue, Suite 990
Cleveland, OH 44114
P: 216-413-3851
david.zulandt@dinsmore.com
*Attorney for Defendant*

**TODAY** is February 8, 2021.

**COLLUM & PERRY**

*/s/ M. Shane Perry*
M. Shane Perry
NC Bar No. 35498
109 W. Statesville Ave.
Mooresville, NC 28115
P: 704-663-4187
shane@collumperry.com

22